IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 24, 2011

**STATE OF TENNESSEE v. MICHAEL ALVIN YOUNG**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S52,872    Robert H. Montgomery, Jr., Judge**

_____

**E2012-00726-CCA-RM-CD - Filed June 28, 2012**

_____

A Sullivan County jury convicted the Defendant, Michael Alvin Young, of aggravated kidnapping and domestic assault. The trial court merged the two convictions and sentenced the Defendant to eight years and six months in the Tennessee Department of Correction. On appeal, the Defendant contended that the evidence was insufficient to support his aggravated kidnapping conviction and that he received the ineffective assistance of counsel at trial. After a thorough review of the record and the applicable law, this Court affirmed the trial court's judgment. *See State v. Michael Alvin Young*, No. E2010-00849-CCA-R3-CD, 2011 WL 5517281 (Tenn. Crim. App., at Knoxville, Nov. 9, 2011). The Defendant filed a Rule 11 application, pursuant to the Tennessee Rules of Appellate Procedure, to the Tennessee Supreme Court. Our Supreme Court granted the application and remanded the case to this Court for reconsideration in light of *State v. Jason Lee White*, 362 S.W.3d 559 (Tenn. 2012). After considering the facts and circumstances of this case as compared to those in *White*, we again affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JERRY L. SMITH, J., not participating.

C. Brad Sproles, Kingsport, Tennessee, for the Appellant, Michael Alvin Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Kaylin Render-Hortensfine, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

# I. Procedural Background

The trial court filed its judgments in this case on March 23, 2009. On April 3, 2009, the Defendant filed a timely motion for new trial, and, after a hearing on the motion, the trial court denied the Defendant's motion in a written order on April 16, 2010. On the same day, the Defendant filed a timely notice of appeal.

On direct appeal, this Court concluded that sufficient evidence existed to support the Defendant's aggravated kidnapping conviction and that the Defendant received the effective assistance of counsel.

On March 9, 2012, the Tennessee Supreme Court issued an opinion, *State v. Jason Lee White*, 362 S.W.3d 559 (Tenn. 2012), that reviewed Tennessee's kidnapping statutes and concluded that our current kidnapping offenses "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id.* at *14. Our Supreme Court stated that, "[s]pecifically, trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at *15. In order to protect the due process rights of those on trial for kidnapping and an accompanying felony, the Supreme Court said that "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* The Supreme Court then set forth an instruction that should be provided to juries on the "substantial interference" element of a kidnapping offense. *See id.* at 17. Thereafter, our Supreme Court remanded the Defendant's Rule 11 application to this Court for reconsideration in light of *White*.

# II. Factual Background

This case arises from the Defendant's kidnapping and assault of his girlfriend on July 29, 2006. Based on these events, a Sullivan County grand jury indicted the Defendant for aggravated kidnapping, domestic assault, two counts of reckless aggravated assault, and reckless endangerment.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: Lindsey Bishop, the victim's friend, testified that she, the victim, and another friend, Madison Hill, went to "Club Up" at around midnight. Bishop recalled that she drank three beers that night and that

she also observed the victim drinking alcohol. Bishop said that the three women were out on the dance floor when the Defendant approached the victim from behind and grabbed the victim's hair so forcefully that it lifted her off the floor. The Defendant then pulled the victim to the side of the dance floor where the victim hit her head on a pole. Bishop described the victim as "upset," "hurt," and "crying." When Bishop approached the arguing couple, the victim did not acknowledge her, so Bishop left to pay her bill. When she returned to where the Defendant and the victim had been arguing, they were gone.

Bishop testified that, as she exited Club Up, she heard screaming. Bishop ran toward the screaming and saw that the victim was partially in a car by which Hill was also standing. The Defendant pushed Hill down and then picked up the victim's legs, put them inside the car, and closed the car door. Bishop said that she opened the passenger side door of the car to check on the victim, who had lost her shoes in the struggle and was crying with her head in her hands. Before Bishop could speak with the victim, the Defendant started the car and drove it in reverse, causing the car door to knock Bishop over, and then sped away. Bishop said that she sustained bruises and scratches from being knocked to the ground by the car door. Bishop said that later, at the police station, she gave a statement about these events to the police.

On cross examination, Bishop agreed that, while she was present during the altercation between the victim and the Defendant, the victim never indicated she wanted to leave the club with Bishop.

The victim testified that, at the time of this incident, she lived with the Defendant. The victim said that on the night of July 29, 2006, she arranged to go out with some friends and to meet up with the Defendant later that night at Club Up. The victim rode to Club Up with Bishop, and, when they arrived, they drank and talked with friends. The victim admitted drinking that night and, although she did not recall how many drinks, she agreed that she was "intoxicated." When asked to describe her contact with the Defendant that night, the victim said the following:

> The only thing that I really remember is I believe maybe [Hill] or [Bishop] and I were going to the dance floor to dance and I had saw him sitting at the bar and [Hill] and I went to say hi or whatever and then after that I don't really recall anything.

The victim further explained that she "bruise[d] very easily so [she] always [had] bruises." The State then showed the victim photographs taken the morning of this incident, and she identified a knot on her head in one of the photographs. The victim testified that she did not have that knot on her head before she went to Club Up that night.

-3-

On cross-examination, the victim testified that she did not know how she got the knot on her head. The victim confirmed that she remembered speaking with the Defendant at the bar and the next thing she remembered was a police officer pulling them over for speeding. The victim said that she spoke with the police officer, outside the Defendant's presence, and that she never told the police officer that she was in trouble or needed assistance. The police officer then released the Defendant and victim, and they went to their apartment. At some point, the victim wanted cigarettes, so the Defendant drove the victim to a store where police officers asked the Defendant and victim to go to the Kingsport Police Department. The victim agreed that she and the Defendant "voluntarily" went to the police station.

Madison Hill testified that she knew the victim because the two worked together at Cheddar's restaurant. Hill said that on the night of July 29, 2006, she went to Club Up with the victim and Bishop. While out on the dance floor, the Defendant approached the victim, grabbed her by the hair, and in the course of doing so knocked the victim's head against Hill's head. Hill said she then watched as the Defendant "push[ed], shov[ed], and dr[u]g" the victim outside. The victim fought against the Defendant, kicking and screaming. Hill followed the Defendant and victim out into the parking lot where the Defendant carried the victim over his shoulder and then put her into his car. The victim tried to get out of the car, and Hill attempted to help her. After trying unsuccessfully to get the victim out of the car, Hill went to the back of the car to get the license plate number. While she was doing so, the Defendant backed up and hit Hill, knocking her down and scraping her right knee. On cross-examination, Hill admitted that she had been drinking that night and agreed she was "[v]ery" intoxicated. Hill clarified that she did not think the Defendant hit her with the car intentionally. She further explained that the reason she tried to get the license plate number and help the victim out of the car was because she believed the victim needed "protection and help." Hill said that the victim, "didn't want to leave."

Matthew Smith testified that he drove to Club Up on the night of July 29, 2006, to give Bishop a ride home. When he arrived, Smith observed the Defendant dragging the victim down the sidewalk while the victim screamed, "Help me, help me, please somebody help me." Smith watched as the Defendant put the victim in a car and "quickly" drove off.

Officer Penny Makowski, a Kingsport Police Department officer, testified that she interviewed Madison Hill, Lindsey Bishop and Corrine Roebuck, each of whom witnessed these events. Officer Makowski said that she also interviewed the victim, who she described as "very upset, crying, injured, [and] scared" during the course of the interview.

Based upon this evidence, a jury convicted the Defendant of aggravated kidnapping and domestic abuse. The trial court merged the two convictions and ordered the Defendant to serve eight years and six months in the Tennessee Department of Correction.

## B. Hearing on Motion for New Trial

After the trial, but before the sentencing hearing, the trial court appointed a new attorney (hereinafter referred to as "Appellate Counsel") for the Defendant. Appellate Counsel filed the motion for new trial, which included claims that the Defendant's trial counsel (hereinafter referred to as "Counsel") was ineffective. The trial court held four hearings on the Defendant's motion for a new trial. At the first hearing date, on November 4, 2010, the Defendant told the trial court that he was unhappy with Appellate Counsel. Upon questioning, the trial court re-set the hearing date to provide Appellate Counsel and the Defendant an opportunity to resolve the Defendant's concerns about his representation.

### 1. Motion for New Trial Hearing - November 30, 2009

At the second hearing on the Defendant's motion for a new trial, the Defendant testified about an alleged conflict that he believed prevented Counsel from representing him at trial. The Defendant said that, initially, a general sessions judge appointed an attorney from the public defender's office to his case. The Defendant agreed that this attorney withdrew from the case. He explained that the public defender wanted him to waive the preliminary hearing, and he disagreed. The public defender told him to go back to his holding cell and then returned "five minutes later saying that [the Defendant had] called her a name or whatever." The Defendant said that "then she just left," and the general sessions court judge appointed a private attorney to represent him.

The Defendant testified that, after the case was sent to criminal court, the trial court, because the Defendant was once again no longer represented, appointed Counsel, a public defender, to represent him. At the time of Counsel's appointment, Counsel stated to the trial court that he "may have a conflict with representing" the Defendant. The Defendant explained that, at the time, he did not understand the meaning of "conflict of interest," and the issue was never raised or discussed again.

Counsel also testified at this hearing, agreeing that the trial court appointed him to represent the Defendant. Counsel said he was unaware that the Defendant allegedly called the first public defender appointed to represent him an insulting name. Counsel said that neither the public defender nor the Defendant ever mentioned the name-calling incident. Upon questioning by the trial court, Counsel said, "I have no recollection of there being a conflict at all and if there was something brought to my attention that someone else was assigned this case, a private attorney, then usually I would make inquiry as to the support staff to check." Counsel went on to explain that, even had he been told that the Defendant called another public defender in his office a name, such an incident was not something he believed would prevent the public defender's office from handling the case. When asked whether he

remembered making a statement to the trial court about a conflict with the Defendant's case, Counsel responded, "I do not recall that. That doesn't mean it didn't happen. I mean if I said it in open court it will be on the record but I do not recall that at all." After this evidence was presented, the trial court set another date upon which to resume the hearing.

## 2. Motion for New Trial Hearing - March 15, 2010

At the next hearing, the Defendant offered the testimony of Crystal Heishman, the Washington County Sheriff's Department officer who stopped the Defendant for speeding while he was driving the victim away from Club Up. Officer Heishman testified that, on the night of July 29, 2006, she conducted a traffic stop involving the Defendant as the driver of the vehicle. Officer Heishman said that she was summoned to court for the Defendant's original trial date, and she brought with her the video recording of the traffic stop. She showed the video recording to both the State and Counsel. Counsel ultimately did not call Heishman to testify at trial. Officer Heishman speculated that Counsel did not call her to testify in part because she believed the victim lied to her during the traffic stop. During the stop, when Officer Heishman approached the vehicle to speak with the Defendant, she observed the victim with "tears running down her face" and "blood on her arm." The Defendant denied that he assaulted the victim, and, when Heishman separated the victim from the Defendant to give her an opportunity to tell the officer the truth, the victim maintained that the Defendant did not hurt her. The victim explained that she received the injuries during a fight at a club with another female. Officer Heishman had "no reason to doubt her," so she released the Defendant and the victim after she gave the Defendant a traffic citation.

Whitney Taylor, an attorney in Kingsport, Tennessee, testified that he represented the Defendant on charges unrelated to the present case. Taylor recalled a meeting where Counsel, the Defendant, and he met to discuss a possible plea negotiation for all of the Defendant's charges in this case and the charges for which Taylor represented the Defendant. Taylor said Counsel reviewed the Defendant's charges with him and the possible punishments. Taylor said that Counsel did a "very thorough job" in reviewing the case with the Defendant.

The Defendant testified that Counsel was ineffective for failing to call Officer Heishman and present the video recording of the traffic stop. The Defendant complained that Counsel had mentioned the officer as a witness in opening argument and should not have done so if he did not intend to call the officer to testify. The Defendant said that Counsel never discussed with him the content of Officer Heishman's testimony or the decision whether to call her. The Defendant said that the video recording of the traffic stop would have refuted the State's evidence that the Defendant kidnapped the victim because the video showed the victim freely exiting the vehicle two times during the course of the video recording.

-6-

The Defendant said that, after Officer Heishman released them, he drove to their apartment. Shortly thereafter, the victim wanted cigarettes, so the Defendant drove her to the store. Upon arriving at the store, a police officer approached the Defendant and requested the Defendant's identification. The officer then asked the victim if she was okay, and she replied that she was okay. The officer returned to his vehicle to check the Defendant's identification, and, when he returned, he told the Defendant about the allegations of kidnapping. The Defendant testified that the victim told the officer that the Defendant had not kidnapped her. The officer then asked if they would be willing to follow him to the police station to "straighten this out." The Defendant agreed, and he drove the victim to the police station. The Defendant testified that he and the victim were separated, and, a short time later, an officer took the Defendant to booking on charges of domestic assault. The Defendant explained that Counsel should have used this information to show that the victim was not kidnapped because police allowed her to stay in the vehicle with the Defendant while he willingly drove to the police station. The Defendant agreed that Counsel asked the victim on cross-examination if she willingly went to the police station, but he maintained that Counsel should have "[brought] it out properly" and called the officers involved to testify.

The Defendant testified that Counsel was ineffective for failing to file a motion to suppress Bishop's and Hill's statements to the police because they were intoxicated at the time they provided the statements. The Defendant said that he never asked Counsel to file a suppression motion, but he did inform Counsel that both witnesses were intoxicated the night of the incident. Upon questioning by the trial court, the Defendant agreed that the witnesses' statements were not introduced at trial. Further, the Defendant agreed that Counsel cross-examined both witnesses on the issue of intoxication. The Defendant clarified that he believed that neither witness should have been allowed to testify at all because they were intoxicated the night of the incident. Specific only to Hill's testimony, the Defendant claimed that Counsel failed to present to the jury that Hill was under the age of twenty-one at the time she drank alcohol. In explaining this issue, the Defendant said, "I mean how was she able to testify to anything when I mean she wasn't even of age to even been drinking in the club that night. Actually she should have been in jail with me, to be honest."

The Defendant testified that Counsel failed to "effectively" cross-examine Officer Makowski. Officer Makowski testified at trial that Hill had been drinking but that she did not believe Hill to be so impaired that she could not give a statement. The Defendant argues that this statement directly conflicts with Hill's statement that she was "very much so intoxicated," and Counsel should have cross-examined Officer Makowski on these conflicting statements.

The Defendant claimed that Counsel was ineffective for failing to interview the victim. Although the Defendant never discussed this with Counsel, the Defendant testified that interviewing the victim should have been obvious to Counsel. The Defendant testified that

he was still in contact with the victim at the time of trial and rode to the courthouse with her on the day of his trial. The Defendant said that he did not know if Counsel was aware of the Defendant's continued contact with the victim. The Defendant said that the victim gave a victim impact statement for the presentence report wherein she said that the Defendant did not kidnap her. The Defendant testified that the trial court should consider the victim impact statement as newly discovered evidence because the victim never gave a statement prior to the Defendant's trial.

Finally, the Defendant testified that Counsel failed to discuss potential strategies and tactical choices with him. As an example, the Defendant referred to Counsel's decision not to call Officer Heishman to testify. The Defendant said that Counsel discussed the possible plea agreement with him, but Counsel did not discuss trial strategies.

At this point, the Defendant requested that he be allowed to make an offer of proof as to what his testimony would have been at trial. The State objected to the Defendant's making an offer of proof because the State was not prepared to cross-examine the Defendant two years after trial without notice, and the State contended that the Defendant would now benefit from hindsight. The trial court reset the hearing to give the attorneys an opportunity to prepare for the offer of proof.

### 3. Motion for a New Trial Hearing - March 22, 2010

The trial court allowed the Defendant to make an offer of proof as to his testimony had he elected to testify at trial. The Defendant made the following offer of proof as to the events of July 29: The Defendant testified that he and the victim lived together, and the victim wanted to go to Club Up with Bishop and Hill. The Defendant said that he was not angry with the victim for going but that the victim's mother had advised the victim not to go, and the Defendant had a "bad feeling" about her going. The Defendant said that he too advised the victim not to go but that ultimately he "let her go out." The Defendant had other plans for the evening, which were later cancelled, so he called the victim and told her he would join her at Club Up.

The Defendant testified that he had been at the club probably 45 minutes to an hour when the altercation between he and the victim occurred. The Defendant said that as the victim and Hill walked out onto the dance floor they were "trying to hold each other up," and the victim was about to fall due to the level of their intoxication. The Defendant admitted that he was "kind of angry" as he made his way out on to the dance floor that the victim was "not handling herself properly." The Defendant said that he approached the victim from behind and grabbed her hair, which caused the victim to lose her footing and fall. The Defendant said that he reached down and picked the victim up but that she "jerked away" from him. At this

point, a female unknown to the Defendant approached and began yelling and cursing at the Defendant. A bouncer for the club then approached and asked the Defendant if he needed any help. The Defendant explained to the bouncer that his girlfriend was intoxicated and, because of another unrelated altercation in the club, the Defendant wanted to get her out of the club "before anything happens." While the Defendant was speaking with the bouncer, he lost sight of the victim but later found her leaning against the rail at the edge of the dance floor with another girl unknown to the Defendant. This girl was yelling and cursing at the victim, but there was no physical contact between the two women. The Defendant said that he stepped in between the victim and this unknown girl and moved the victim "to the side." The Defendant tried to calm the victim and explained to her that there was an altercation in the club and that they needed to leave. The victim agreed, and the two left the club.

The Defendant testified that, as they walked down the steps to get out of the club, Hill approached, yelling to the victim not to leave with the Defendant. The victim, wearing high heels, lost her footing on the stairs and fell down. The Defendant said that he grabbed the victim's arm, and the victim kicked off her shoes. The victim then started "go[ing] off" on the Defendant telling him that she could, "walk by [her]self." The Defendant described the victim as "screaming" and "flailing." The Defendant testified that he again attempted to calm the victim as they proceeded toward the car. Hill began screaming for help and grabbed the victim's arm. The victim pushed Hill back, knocking Hill down onto the ground. The Defendant said that they passed people as they went out to the car but that he did not know any of those people.

The Defendant testified that when they finally reached the car, Hill was still yelling, so the Defendant suggested that Hill ride with them. Hill ran to a nearby truck and asked the driver to call the police. The Defendant also approached the truck and explained that Hill was drunk and asked the driver if he knew Hill and could help the Defendant. The driver never responded and Hill ran back to the car and tried to get the victim out. The Defendant again assured Hill that the victim was fine and offered to give Hill a ride home. The Defendant said that Hill would not listen to him, so he got into the car and put the car in reverse. At this point, Bishop appeared and tried to open the passenger side door as the Defendant was reversing the car. The Defendant said that he stopped the car, and he told the victim to shut the car door, during which time, Bishop and Hill yelled and banged on the car windows instructing the victim to "get out of the car."

The Defendant explained that the victim had ample opportunity to get out of the car had she wanted to do so. The Defendant said that the victim was alone in the car while he approached the man in the truck approximately thirty feet away. The Defendant denied forcing the victim to leave the club or get into the car with him.

The Defendant testified that, on their way home, Officer Heishman pulled their car over. After this traffic stop, they continued to their apartment, which was two or three minutes from where the officer pulled them over. The Defendant said that when he pulled into the driveway, the victim indicated that she wanted cigarettes, so he drove her to the store. On their way to the store, he noticed two Kingsport police cars driving fast. A third police car behind the first two police cars slowed and followed the Defendant into the store parking lot. An officer approached the car and asked for the Defendant's identification. The Defendant provided his driver's license, and the officer returned to his car and talked with officers from three other police vehicles that had also arrived at the store. The Defendant testified that when the officer returned, he told the Defendant that someone reported that the Defendant kidnapped the victim. The Defendant also testified that the victim told the police officer, "[The Defendant] did not kidnap me." The officer looked at the Defendant and victim, shrugged his shoulders, and asked if the Defendant would drive to the police station "to straighten this out." The Defendant agreed and followed the officer to the police station where he and the victim were separated. An officer retrieved the Defendant "three minutes later" and took the Defendant to booking. The Defendant asked why he was being arrested and the officer said for "domestic violence." The Defendant testified that he "accepted that" because he had pulled the victim's hair, but the next morning he learned that he was charged with kidnapping and "all the other stuff."

When asked about Officer Heishman's description of the victim during the traffic stop as "crying and bleeding," the Defendant denied any knowledge of blood on the victim. As to the victim's crying, he explained that the victim had fallen asleep during the drive and he woke her when the officer pulled them over. The Defendant "guess[ed]" the victim began crying when he woke her because she was worried that the Defendant might get in trouble due to her friend's threats at the club to call police.

The Defendant testified that he never gave Counsel a list of potential witnesses but that he told Counsel "about the bouncers and everything." The Defendant agreed that, although Counsel did not ask Hill about her age, he did ask another witness about the fact that Hill was underage and drinking the night of this incident.

Counsel testified that the Defendant was indicted on five charges, but the jury convicted the Defendant of only two of those charges. Counsel said that he interviewed the victim's mother, but he did not believe she could contribute anything to the evidence because she was not present. Counsel said that he believed he also spoke with the victim either on the phone or in person because he knew that the victim was "pleading amnesia."

Counsel testified that he made the decision to not call Officer Heishman. He maintained, however, that he explained the decision to the Defendant before releasing Officer

-10-

Heishman from the subpoena, and the Defendant agreed. Counsel recalled that he spoke with Officer Heishman numerous times before trial, and it became "abundantly clear" that Officer Heishman was "embarrassed by the fact that she felt, rightly or wrongly, . . . that she had been somehow lied to at the stop." Officer Heishman made clear to Counsel that she wanted to let the jury know that she made a mistake by letting the Defendant go that night. Further, the video recording showed Officer Heishman asking the victim why she was crying, and the Defendant interjected before the victim could answer, offering that the victim was involved in an altercation with another female. Counsel believed this to be inconsistent with the trial testimony. Counsel explained that he did not want to provide the jury with evidence that raised the inference that the victim and the Defendant may have created a "cover-up story."

Counsel testified that he met with the Defendant at each of the court hearings and on at least on three additional occasions. One of the meetings was at Taylor's office to discuss a settlement. After reviewing the charges and potential punishments with the Defendant, Counsel negotiated a favorable plea with the State. The Defendant indicated he would accept the offer but wanted to first discuss the offer with his grandmother. Then, he would let Counsel and Taylor know his final decision. Counsel said he did not hear from the Defendant for a month but recalled that he unsuccessfully attempted to contact the Defendant; although, he made no notes indicating the attempted contact. The next contact Counsel had with the Defendant was the day of trial, and the Defendant told Counsel he would not accept the plea offer.

In reference to the Defendant's complaint that Counsel failed to suppress the statements of Hill and Bishop, Counsel said that the statements never came in at trial. Counsel recalled that Hill's and Bishop's testimony at trial was detrimental to the State's case in that they both freely admitted they were drinking and intoxicated the night of these incidents. Counsel testified that he reviewed the case with the Defendant. Counsel did not recall the Defendant providing the names of any specific witnesses other than Officer Heishman.

On cross-examination, Counsel acknowledged that he did not have a "rock solid recollection of sitting down with [the victim]," but he knew she claimed amnesia. Counsel said that he positively "sat down" with the victim's mother. Counsel testified that he did not review the police videotape of Officer Heishman's traffic stop with the Defendant because he did not have access to the video for very long.

Counsel agreed that he mentioned Officer Heishman in opening argument. Counsel explained that, at that time, he believed the victim was going to testify that she did not remember anything, so he thought the only way to get the traffic stop before the jury was

Officer Heishman's testimony. Once on the stand, however, the victim testified about the relevant portions of the traffic stop. Counsel said that he then decided not to call Officer Heishman because he believed the victim's testimony was "better."

Counsel testified about the decision to not call the Kingsport police officers as witnesses at trial. He said that it is a "very, very dicey prospect to place arresting officers on the stand as your witness." The potential for damage to the Defendant's case on the State's cross-examination is great, and he wanted to prevent that opportunity for the State. Counsel did not recall the Defendant requesting that Counsel subpoena the Kingsport officers.

Appellate Counsel called the Defendant as a rebuttal witness. The Defendant testified that he did tell Counsel that he wanted the Kingsport officers present during his trial. The Defendant agreed that he did not provide the officers' names to Counsel, but he believed they were in the police report. The Defendant said that "we" tried to get the Kingsport officers "to come to this hearing but for some reason nobody knows who they are."

Based upon this evidence, the trial court denied the Defendant's motion for a new trial.

### III. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his aggravated kidnapping conviction and that he received the ineffective assistance of counsel.

### A. Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to support his aggravated kidnapping conviction because the victim's testimony "clearly indicate[d] that she did not view the circumstances of the night in question as kidnapping." The State responds that the testimony of several people who saw the Defendant grab the victim by her hair, removing the victim from the club, which caused her to suffer injury, and forcing her into the car is sufficient evidence for a jury to find the Defendant guilty of aggravated kidnapping.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a

criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) *(*quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the jury convicted the Defendant of aggravated kidnapping, which requires proof beyond a reasonable doubt that a defendant falsely imprisoned a victim, and the victim suffered bodily injury. T.C.A. § 39-13-304 (2010). False imprisonment occurs where a defendant "knowingly removes or confines another unlawfully so as to interfere substantially

with the other's liberty." T.C.A. § 39-13-302(a) (2010).

The evidence, considered in the light most favorable to the State, proves that the Defendant grabbed the victim's hair, jerking her up off of the dance floor and causing her head to hit Hill's head. While the Defendant maintained his grip on the victim's hair, the victim fell numerous times on the dance floor until the Defendant pulled her to the side of the dance floor, where her head hit a pole, causing a large knot on her head. The Defendant and the victim then engaged in a verbal argument before exiting the building. Upon their exit, the Defendant was seen "push[ing], shov[ing] and drag[ging]" the victim out of the club while the victim tried to resist by hitting the Defendant and screaming for help. The Defendant physically put the victim into the car and drove away.

This evidence shows that the Defendant physically removed the victim against her will from the dance floor and the club. Due to this interaction, the victim suffered bodily injury, a knot to her head. Accordingly, we conclude that the evidence is sufficient to support the jury's finding the Defendant's guilt of aggravated kidnapping beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

As part of the Defendant's sufficiency argument, he claims that convictions for both aggravated kidnapping and domestic assault violate double jeopardy. The State responds that because the two convictions were merged, the Defendant's argument is without merit. We agree.

The Double Jeopardy Clauses of the United States and Tennessee Constitutions both state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. 5; Tenn. Const. art. I, § 10. In addition to protecting against a second prosecution for the same offense in which the defendant either received a conviction or an acquittal, this clause has also been interpreted to protect against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989); *State v. Phillips*, 924 S.W.2d 662, 664 (Tenn. 1996).

In this case, the jury found the Defendant guilty of both aggravated kidnapping and domestic assault for the same offense. The trial court, however, merged the two verdicts under one conviction as reflected on the judgment forms. Thus, the Defendant was subject to only one punishment, a sentence of eight years and six months, for aggravated kidnapping. A double jeopardy problem does not exist where the trial court's entry of only one judgment

of conviction imposes only one sentence, protecting the defendant from receiving multiple punishments for the same offense. *State v. David Eric Price*, No. E1999-02684-CCA-R3-C, 2000 WL 1015914, at *31 (Tenn. Crim. App., at Knoxville, July 25, 2000); *see also State v. Addison*, 973 S.W.2d 260, 266-67 (Tenn. Crim. App. 1997); *State v. Zirkle*, 910 S.W.2d 874, 889 (Tenn. Crim. App.1995).

Lastly, even in light of *State v. Jason Lee White*, 362 S.W.3d 559 (Tenn. 2012), we affirm the judgment of the trial court and conclude that the evidence was sufficient to support the Defendant's conviction of aggravated kidnapping. *White* requires that "juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *White*,362 S.W.3d at 578. In returning such verdicts, *White* requires that the juries be properly instructed as to the elements of kidnapping, aggravated kidnapping, and/or especially aggravated kidnapping. *Id.* Specifically, the Supreme Court provided trial courts with a detailed jury instruction on the meaning of "substantial interference" as it is stated in the kidnapping statutes. *See id.* at 580-81. Although the jury in this case was not given instructions that specifically defined "substantial interference," the trial court did give the standard jury instructions regarding aggravated kidnapping and kidnapping, specifically defining one's "liberty" upon request from the jury.

After reviewing the facts and circumstances of this case, we conclude that, whether the trial court had provided the jury with instructions as detailed in *White* or the standard instructions without the additional explanation of "substantial interference," the evidence was legally sufficient for the jury to convict the Defendant of both aggravated kidnapping and domestic assault, the "accompanying" offense in this case, as contemplated by *White*.[1] As mentioned previously, the Defendant first entered the club, grabbed the victim's hair, and forced her off the dance floor, which caused her to injure her head. The Defendant then forcefully pushed and shoved the victim out of the club while the victim attempted to resist and scream for help. The Defendant proceeded to physically place the victim into his vehicle against her will and drive away from the premises with the victim in the vehicle. Based on this evidence, the jury convicted the Defendant of aggravated kidnapping and domestic assault. The facts in this case do not involve an aggravated kidnapping in which the victim's removal or confinement was "essentially incidental" to the conduct that constituted the

---

[1] In *White*, the Supreme Court uses "accompanying felony" throughout the opinion. In our view, "accompanying offense" would also be appropriate, as the same issues dealt with in *White* may arise in cases involving felonies, misdemeanors, or, as in this case, a combination of the two.

domestic assault. The elements of domestic assault do not include restraint, removal, or confinement. In the present matter, the Defendant approached the victim from behind the dance floor, grabbed her by the hair, and slammed her into a pole. Any failure by the trial court to provide a detailed definition of "substantial interference," as suggested in *White*, would not implicate the Defendant's due process rights. The jury was, therefore, properly instructed in this case. As a result, we conclude that the evidence was sufficient for the jury to find the Defendant guilty of aggravated kidnapping and domestic assault beyond a reasonable doubt.

The Defendant is not entitled to relief as this issue.

## B. Ineffective Assistance of Counsel

The Defendant asserts that he received the ineffective assistance of counsel because Counsel failed to adequately investigate the case and made numerous errors during the trial. The State responds that the Defendant failed to prove Counsel's deficiency or that any alleged deficiency prejudiced the Defendant.

Claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington*, 466 U.S. 668, 689-90, 694 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. *See* T.C.A. §§ 40-30-109(a), -110 (2006). Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f) & (h) (2006). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40-30-106(f). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."

T.C.A. § 40-30-106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness of counsel claim in a direct appeal, we will proceed with our analysis of each of the Defendant's claims.

Under Tennessee Code Annotated section 40-30-110(f), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n.5 (Tenn. 1999) (*citing State v. Anderson*, 835 S.W.2d 600, 607 (Tenn . Crim. App. 1992)). The factual findings entered by the trial court are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d

508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If a defendant shows that counsel's representation fell below a reasonable standard, then the defendant must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Failure to call Officer Heishman as a Witness

The Defendant alleges Counsel was ineffective because at trial he failed to call Officer Heishman to testify and present the video of the traffic stop. The State responds that Counsel's actions reflect a trial strategy and, thus, the trial court properly denied the Defendant relief on this basis.

-18-

The trial court made the following findings as to this claim:

> I [] accredit [Counsel's] testimony that [the Defendant] and [Counsel] discussed it and you were in agreement with that. In fact . . . I was sitting here noting that right before you were put . . . under oath to testify about your decision not to testify, [Counsel] said, "You know, I have subpoenaed the officer, Crystal Heishman. I did call her and then I called her off. I've informed the prosecutor that since she was under subpoena if she desired her to be here that she could, that she would still be available but she also indicated it was okay to let her go." And so obviously the [D]efendant was aware that [Counsel] had made the decision to call [Officer Heishman] off and so . . . that's why I accredit [Counsel's] testimony that he spoke with [the Defendant] about that."

The trial court further noted that Officer Heishman's testimony that she noticed blood on the victim's arm and that the victim cried during the traffic stop was never presented to the jury, but it would have been had Officer Heishman testified at trial and/or the video recording had been played for the jury.

At the motion for new trial hearing, Counsel testified that, based upon his multiple discussions with Officer Heishman, he believed her testimony would suggest to the jury that the Defendant tried to "cover up" what really happened. Counsel based this upon his impression that Officer Heishman felt "embarrassed" and believed the Defendant and victim lied to her. Counsel testified that Officer Heishman made it clear that she should not have released the Defendant and victim that night. Additionally, our review of the video recording of the traffic stop reveals Officer Heishman asking the victim about blood on her arm and why the victim was crying during the traffic stop. The video shows the Defendant cutting off the victim's response to the officer's question, telling the officer that the victim engaged in a physical altercation with another female at Club Up. At trial, there was no evidence of an altercation between the victim and another female. Counsel said that he subpoenaed Officer Heishman because he believed it was the only way to introduce the traffic stop due to the victim's claim of amnesia. Upon cross-examination at trial, however, the victim testified as to the pertinent portions of the traffic stop. Based upon this testimony, Counsel said that he no longer needed Officer Heishman's testimony about the traffic stop. Additionally, the trial court accredited Counsel's testimony that he first spoke with the Defendant about the decision to not call Officer Heishman to testify and that the Defendant agreed.

-19-

We conclude that Counsel's decision not to call Officer Heishman was a trial strategy based upon an informed choice. Moreover, at the time of trial, the Defendant agreed with this trial strategy. Further, the Defendant failed to show how Counsel's decision not to call Officer Heishman to testify prejudiced his defense. The Defendant is not entitled to relief as to this issue.

## 2. Failure to Call Kingsport Police Officers to Testify

The Defendant alleges that Counsel was ineffective for failing at trial to call, as witnesses, the Kingsport Police officers present when one officer requested that the Defendant and the victim go to the police station. The Defendant asserts that these officers would have testified that they allowed the victim to ride to the police station with the Defendant and that the victim said that she was not kidnapped. The State responds that the Defendant waived this issue due to his failure to call any of these officers at the motion for new trial hearing. We agree with the State.

"When a [defendant] contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the [defendant] at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id.* The reviewing court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id.*; *see also Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995). Thus, we conclude that the Defendant failed to demonstrate that Counsel was ineffective in this respect. The Defendant is not entitled to relief as to this issue.

## 3. Failure to File Motions to Suppress Statements of Hill and Bishop

The Defendant claims that he received the ineffective assistance of counsel at trial because Counsel failed to file motions to suppress Hill's and Bishop's police statements due to their intoxication at the time they made the statements. The State responds that Hill's and Bishop's police statements were never entered at trial.

Hill and Bishop both testified at trial and acknowledged that they gave statements at the police department; however, these statements were never introduced at trial. On cross-examination, the jury heard Counsel question these witnesses about their intoxication that night and both witnesses readily agreed to being intoxicated. Thus, we conclude that the

Defendant failed to demonstrate that Counsel was deficient in this respect. The Defendant is not entitled to relief as to this issue.

### 4. Cross-examination of Officer Makowski

The Defendant next contends that he received the ineffective assistance of counsel at trial because Counsel failed to "effectively cross-examine Officer Makowski; and his failure to present to the jury that Madison Hill was under 21 and drinking at the time of her statement." The State responds that the Defendant waived this issue for failure to present Officer Makowski as a witness during the motion for new trial hearing.

It is incumbent upon a defendant to present evidence which he claims Counsel was ineffective for failing to present. *See Black*, 794 S.W.2d at 757. Because the Defendant did not call Officer Makowski at the motion for new trial hearing, we cannot review what Officer Makowski's response would have been to a question about Hill's testimony that she was very intoxicated the night of this incident. We note, however, that Officer Makowski testified at trial that the women had been drinking but, at the time of their statements, they were not so impaired as to prevent them from giving statements. Further, on cross-examination at trial, Counsel asked Bishop about Hill's age at the time of this incident. We conclude that the Defendant failed to show that Counsel was deficient or that prejudice resulted. The Defendant is not entitled to relief as to this issue.

### 5. Failure to Interview the Victim

The Defendant asserts that he received the ineffective assistance of counsel because Counsel failed to interview the victim prior to trial. The State responds that, because the trial court declined to find Counsel's performance deficient as to this issue, the trial court implicitly accredited Counsel's testimony that he interviewed the victim before trial. The trial court made a finding that "everybody" believed the victim planned to testify at trial that she had no memory of the event. Based upon the victim's claim of amnesia, the trial court concluded that Counsel was not deficient in this respect.

Counsel testified that he believed he spoke with the victim before trial because he was aware of the victim's position that she did not remember anything from the night of these events. On cross-examination, he acknowledged that he did not have a "rock solid recollection" of interviewing the victim. As expected, the victim testified at trial that she did

not remember the events of that evening. The Defendant has failed to show what Counsel would have gained by interviewing a victim who had no memory of the events. The Defendant is not entitled to relief as to this issue.

## 6. Conflict of Interest

The Defendant alleges a violation of his right to the effective assistance of counsel because Counsel failed to disqualify himself from representation due to a conflict of interest. The State responds that the Defendant failed to present evidence in support of this argument. The trial court found that the Defendant failed to present evidence that a conflict of interest existed.

At the Defendant's motion for a new trial hearing, Counsel testified that he was unaware of any alleged conflict preventing him from representing the Defendant. Counsel testified that he was unaware of any exchange between the Defendant and an attorney from the Public Defender's office in which the Defendant called the attorney a derogatory name. Further, Counsel testified that, even had he known about this event, he did not believe it would disqualify him from representing the Defendant.

We conclude that the Defendant failed to show that Counsel had a conflict of interest that would disqualify Counsel from representing the Defendant. The Defendant is not entitled to relief as to this issue.

## 7. Failure to take Remedial Action

The Defendant's final claim is that Counsel failed to take remedial action after the trial court discussed with the State the proper sequence in which to admit photographs. The State responds that because the Defendant failed to offer any proof as to this issue at the hearing on the motion for a new trial, he failed to prove this claim by clear and convincing evidence. The State further argues that the Defendant raised this issue in his motion for new trial as an issue of trial court error rather than an issue of ineffective assistance of counsel, thereby waiving this issue as it pertains to the effectiveness of Counsel.

The Defendant points out two occurrences at trial that are the bases for this issue. First, the State asked Hill to narrate the video recording from Club Up. The trial court called

both attorneys to the bench and asked the State how they intended to proceed, advising that the video "speaks for itself." The second incident occurred shortly thereafter when the State published a picture of Hill's injuries to the jury without following the proper procedure for introducing the photograph into evidence. The trial court called both attorneys to the bench and pointed out that the State had "jumped the gun" by displaying the photograph to the jury without first entering it into evidence. The State acknowledged the error and correctly entered the remaining photographs.

The State is correct that in the Defendant's motion for a new trial he argues that the trial court's actions prevented Counsel from making an objection. Tennessee Rule of Appellate Procedure 3 (e) requires that all issues raised on appeal must be "specifically stated" in a motion for a new trial, or the issue "will be treated as waived." The grounds relied upon must be specified with reasonable certainty in a motion for a new trial to advise the trial court and opposing counsel of the alleged error relied upon and also to enable this Court to see that the alleged error was presented to the trial court for correction. *State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981). In this case, the trial court reviewed this issue as an error assigned to the trial court and, thus, the Defendant has waived appellate review of this issue as one of ineffective assistance of counsel. The Defendant is not entitled to relief as to this issue.

## IV. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-23-